UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** <br><br> **Plaintiff,** <br><br> v. <br><br> **BRENT CRANMER, JONATHAN WHITESIDES, and DANIEL MCCORMICK,** <br><br> **Defendants.** | **COMPLAINT** <br><br> **25 Civ. 6816** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff United States Securities and Exchange Commission (the "Commission"), for its Complaint against Defendants Brent Cranmer ("Cranmer"), Jonathan Whitesides ("Whitesides"), and Daniel McCormick ("McCormick"), alleges as follows:

**SUMMARY**

1. This action concerns insider trading by Defendants Cranmer, Whitesides, and McCormick in the securities of Kaman Corporation ("Kaman"). In December 2023, while working as the head of a Kaman subsidiary, Cranmer learned that Kaman was in the process of selling itself. Kaman referred to this sales process using the codename "Project Safeguard" and required all employees who were part of Project Safeguard to represent that they understood the process was highly confidential and that they were prohibited from discussing it with anyone other than a select group of other individuals also working on the project.

2. Immediately after learning about Project Safeguard, Cranmer shared material nonpublic information about the prospective transaction with his close friend, Whitesides, and asked Whitesides to coordinate trading in Kaman securities on Cranmer's behalf. On multiple

occasions over the next several weeks, Whitesides purchased Kaman call options for himself. Whitesides also unlawfully communicated information about the potential transaction to his friend, McCormick, and asked McCormick to trade on Cranmer's behalf.  McCormick did not trade for Cranmer but instead used the material nonpublic information to purchase Kaman stock and call options for himself and to tip his friend, Trader A.  No one traded for Cranmer.

3.       On the morning of January 19, 2024, Kaman announced that Arcline Investment Management, L.P. ("Arcline") had offered to buy Kaman for $46 per share (the "Announcement"), and Kaman's stock price rose by about 101% -- from $22.43 to $45.05. Whitesides and McCormick immediately sold their Kaman securities.  Whitesides realized profits of approximately $922,636, and McCormick realized profits of approximately $115,598.

## VIOLATIONS

4.       Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by engaging in the conduct this Complaint describes.

5.       Defendants will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object, unless they are restrained and enjoined.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

6.       The Commission brings this action pursuant to Exchange Act Sections 21(d) [15 U.S.C. § 78u(d)], 21(e) [15 U.S.C. § 78u(e)] and 21A(a) [15 U.S.C. § 78u-1(a)].

7.       The Commission seeks a final judgment (a) permanently enjoining Defendants from violating Section 10(b) of the Exchange Act or Rule 10b-5 thereunder; (b) ordering Defendants Whitesides and McCormick to disgorge ill-gotten gains they received as a result of

the violations this Complaint alleges, and to pay prejudgment interest pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)]; (c) ordering Defendants to pay civil penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-l]; (d) prohibiting Defendant Cranmer from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)] pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (e) ordering any other further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e) and 78aa].

9.      Venue in this District is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, practices, and courses of business constituting the violations of the federal securities laws alleged herein occurred within the Southern District of New York.  Kaman common stock traded on the New York Stock Exchange ("NYSE"), and some of the purchases described below took place on the NYSE or involved market participants located in this district.

## DEFENDANTS

10.     **Brent Cranmer**, age 51, lives in Mission Viejo, California.  At all relevant times, Cranmer was the Vice President and General Manager of Kaman subsidiary Bal Seal Engineering, Inc. ("Bal Seal").

11.     **Jonathan Whitesides**, age 46, lives in Mission Viejo, California. Whitesides works in the real estate and property management industry and was Cranmer's friend at all relevant times.

12.     **Daniel McCormick**, age 61, lives in Trabuco Canyon, California. McCormick works in sales and marketing and is Whitesides's friend.

## COMMONLY-USED TRADING TERMS

13.     A stock option, commonly referred to as an "option," gives its purchaser-holder the right, but not the obligation, to buy or sell shares of an underlying stock at a specified price per share (the "strike price") within a specific period of time prior to the expiration date ("expiration"). Options are generally sold in "contracts," which give the option holder the opportunity to buy or sell 100 shares of an underlying stock.

14.     A "call" option gives the purchaser-holder of the option the right to purchase a security at a specified strike price prior to expiration. A call option is "out of the money" when the strike price is above the current market price of the underlying security and "in the money" when the strike price is below the market price. Generally, the buyer of an out-of-the-money call option anticipates that the market price of the underlying security will increase so that the option will be in the money before the option expires, thus providing a profit to the holder of the option.

15.     Options are often listed in "series," which consist of the options on a given security with the same strike price and same expiration date.

## FACTS

**I.     Relationships Among the Defendants**

16.     Cranmer and Whitesides met at church several years ago. Their families live near each other, and often spend time together.

17.     Whitesides and McCormick also met through church, and McCormick acted as a mentor to Whitesides while Whitesides prepared for a religious mission.

## II.     Cranmer's Involvement in Project Safeguard

18.     Cranmer was the Vice President and General Manager of Kaman's subsidiary, Bal Seal, from 2022 through spring 2025.

19.     At all relevant times, Kaman had an Insider Trading Policy that applied to all employees of Kaman and its subsidiaries. The Insider Trading Policy specifically prohibited trading on or tipping of material nonpublic information.

20.     On or around December 19, 2023, a Kaman executive told Cranmer that Kaman was in the process of selling itself, and that Cranmer would need to meet with prospective buyers in the coming weeks.

21.     The next day, Cranmer received a Completion Incentive Agreement (the "Incentive Agreement"), which stated that Cranmer would be eligible for an incentive bonus if a Kaman sale occurred.

22.     The Incentive Agreement referred to the Kaman sales process as "Project Safeguard" and included a confidentiality clause instructing Cranmer that he was not allowed to discuss Project Safeguard with anyone other than six individuals named in the agreement.

23.     The Incentive Agreement also had an addendum entitled, "Confidentiality and Non-Disclosure Agreement." The addendum included specific language notifying Cranmer that he may be in receipt of material nonpublic information, and prohibiting him from trading on the material nonpublic information or communicating it to anyone else for the purpose of trading.

24.     Cranmer signed the Incentive Agreement on December 20, 2023.

### III. Cranmer's Breach of Fiduciary Duty

25. On or shortly after the day that Cranmer learned about Project Safeguard, he told Whitesides about the transaction.

26. Cranmer also asked Whitesides if he knew anyone who could trade in Kaman securities on Cranmer's behalf. Cranmer wanted to profit from the material nonpublic information he had regarding Project Safeguard, but knew that he would likely be caught if he traded using an account held in his own name.

27. Later that day or the next day, Whitesides called McCormick. Immediately following the phone call, Whitesides sent a text message to Cranmer.

28. Over the next few weeks, Cranmer updated Whitesides on the progress of Project Safeguard. Cranmer suspected that Whitesides would trade on the material nonpublic information because Whitesides told him that he had opened a brokerage account in the name of his wife, and that he was researching stock options.

29. Cranmer and Whitesides continued discussing the plan to have McCormick trade on Cranmer's behalf. Cranmer gave Whitesides $10,000 to provide to McCormick to fund the anticipated trading.

30. Whitesides met with McCormick and provided him with material nonpublic information regarding Project Safeguard, including that Kaman was the target company, that he knew an insider who had given him the information, and the likely price range. Whitesides offered McCormick the cash to trade on Cranmer's behalf. Instead of taking the cash, McCormick thanked Whitesides for the information and said he did not want to trade for someone else.

### IV. Trading in Advance of the Announcement

31. At all relevant times, Kaman traded on the NYSE under the ticker symbol "KAMN."

32. On December 20, 2023 – the date Cranmer signed the Incentive Agreement – Cranmer called Whitesides at 3:10 p.m.,[1] and the call lasted for 14 minutes. Twenty minutes after the call ended, Whitesides liquidated shares of a mutual fund he owned.

33. At 4:23 p.m. the same day, an account in the name of Whitesides's wife was opened online with options purchasing privileges. The account was at the same brokerage firm that Whitesides used.

34. At 6:47 p.m. the same day, Whitesides called McCormick and the call lasted for about 20 minutes. Immediately following the call to McCormick, Whitesides sent a text message to Cranmer at 7:07 p.m.

35. On December 21, the next day, Whitesides used the proceeds from the sale of his mutual fund shares to purchase 18 Kaman call options in his own account for a total cost of about $570. The options had a strike price of $30 and an expiration of March 15, 2024 (the "March $30 Call Options").

36. These purchases were "out of the money" because at the time, Kaman's stock was trading at about $24 per share, or 20% lower than the $30 strike price. Whitesides's purchases of

---

[1] All times are Eastern Standard Time unless otherwise indicated.

the March $30 Call Options accounted for 100% of the trade volume in this options series on that day.

37. On January 2, 2024, the account in the name of Whitesides's wife made its first purchase, buying 200 March $30 Call Options for about $5,000. This purchase accounted for 99% of the option series' trade volume that day.

38. On January 5, Arcline offered to acquire Kaman for a price of $40 per share. Kaman's stock was trading around $23 per share at the time.

39. On January 10, several other parties submitted offers to buy Kaman for prices between $28 and $38 per share.

40. That same day, Cranmer withdrew $9,000 in cash from his bank account.

41. That evening, Whitesides and McCormick exchanged multiple text messages and calls, then McCormick called his friend, Trader A, and that call lasted for about 12 minutes.

42. On January 11, the account in the name of Whitesides's wife purchased another 200 March $30 Call Options, making up 71% of the option series' trade volume that day.

43. The same day, McCormick and Trader A had a 45-minute phone call during which McCormick bought 1,000 shares of Kaman stock in one brokerage account and 1,500 shares of Kaman stock in another account at a different brokerage firm.

44. McCormick and Trader A also each purchased 40 of the March $30 Call Options.

45. On January 12, Whitesides called his brokerage firm in an attempt to automate the sale of the March $30 Call Options in the event the underlying stock price hit $40 per share. At the time, Kaman's stock price was trading at about $23 per share. During the recorded call, Whitesides said to the customer service representative, "[i]f this particular trade does what I hope it does … can I ask for a disbursement in the form of a check? … Occasionally in my life, you

know I've had kind of successes and when I have successes … I like to frame the check." These statements, and the trading arrangements Whitesides attempted to make with his brokerage firm demonstrate his awareness of the impact the Announcement would have on Kaman's stock price.

46. On January 18, the Kaman board of directors met to discuss a $46 per share offer from Arcline. The same day, the account in the name of Whitesides's wife bought another 200 March $30 Call Options.

47. On January 19, 2024 – before the markets opened – Kaman announced that it would be taken private by Arcline for $46 per share, and its stock price jumped by about 101% from the prior day's closing price of $22.43 to $45.05.

48. Accounts in the names of Whitesides and his wife purchased a total of 618 March $30 Calls between December 21, 2023 and January 18, 2024 for an aggregate cost of about $17,672, and sold them on the day of the Announcement for profits of approximately $922,636.

49. Four separate accounts at three different brokerage firms in the names of McCormick, his wife, and an entity McCormick owns, purchased a total of 2,500 Kaman shares and 40 March $30 Call Options, for an aggregate purchase price of about $58,312. McCormick sold all of these Kaman securities on the day of the Announcement for total profits of approximately $115,598. McCormick's friend, Trader A, made approximately $60,000 in trading profits.

## V.     Events Following the Announcement

50. On the day of the Announcement, Whitesides and Cranmer went to lunch. During lunch, Whitesides confirmed to Cranmer that he had traded on the information Cranmer had provided about Kaman's acquisition. He told Cranmer that he had made some money, and

thanked Cranmer for the information. He also said something like, "if you ever need a favor, or a letter written, or sugar poured in someone's gas tank, let me know."

51. No one ultimately traded on Cranmer's behalf or provided him with money in exchange for the material nonpublic information he had shared.

52. Shortly after the Announcement, the Financial Industry Regulatory Authority ("FINRA") began an inquiry into trading in advance of the Announcement. On May 8, 2024, FINRA provided Kaman's counsel with a list that included the names of certain traders who had purchased Kaman securities before the Announcement (the "Name Recognition List"), and asked that everyone who had been aware of Project Safeguard before the Announcement review the list and identify anyone they knew. Both Whitesides and McCormick were on the list.

53. After Cranmer received the Name Recognition List, he told Whitesides that Whitesides' name was on the list. Whitesides told Cranmer that he should respond by denying that he knew anyone on the list. Whitesides also told Cranmer that he planned to delete text messages between himself, Cranmer, and McCormick.

54. Although Cranmer knew McCormick's name, he did not identify McCormick as a name he recognized.

55. Cranmer knew that it would not be difficult for investigators to establish a connection between himself and Whitesides. Instead of denying that he knew Whitesides, he misrepresented the frequency and nature of their communications in advance of the Announcement.

56. On May 30, 2024, Kaman's counsel responded to FINRA's request regarding the Name Recognition List. Part of the response included summaries of Cranmer's representations to Kaman regarding his communications with Whitesides.

10

57. In response to FINRA's request for a synopsis of contact between Cranmer and Whitesides in the months leading up to the Announcement, Kaman wrote, "Cranmer reported there was minimal contact between Cranmer's awareness date of December 18, 2023 to January 18, 2024 and their discussions were on holiday and travel plans." This was false, as Cranmer and Whitesides had frequent contact during this time, and their discussions included updates on Project Safeguard and a plan to facilitate trading on Cranmer's behalf.

**VI.     Cranmer, Whitesides, and McCormick Violated the Federal Securities Laws**

58. Kaman's information concerning Project Safeguard was material and nonpublic. A reasonable investor would have viewed Kaman's potential acquisition as important to his or her investment decision and as significantly altering the total mix of information available to the public.

59. Cranmer owed a fiduciary or other duty of trust or confidence to Kaman by virtue of his position as the Vice President and General Manager of its subsidiary, Bal Seal.

60. In addition, Kaman's Insider Trading Policy prohibited all employees of Kaman and its subsidiaries from trading on or tipping material nonpublic information. Cranmer also signed the Incentive Agreement, which specifically applied to Project Safeguard, and outlined additional restrictions applicable to Project Safeguard communications.

61. Cranmer knowingly or recklessly tipped Whitesides with material nonpublic information about Project Safeguard in breach of his fiduciary or other duty of trust or confidence to Kaman.

62. Cranmer tipped Whitesides for personal benefits, including the expected benefit of someone else trading and profiting on his behalf, and the benefit of making a gift of material nonpublic information to a friend.

63. Cranmer intended for others to trade on his tips and knew or recklessly disregarded that the recipients of the information, including Whitesides and McCormick, would use the information to trade securities.

64. Whitesides knew, consciously avoided knowing, or was reckless in not knowing that the information he obtained from Cranmer about the impending Kaman acquisition was material and nonpublic.

65. Whitesides further knew, consciously avoided knowing, or recklessly disregarded that the material nonpublic information about Project Safeguard was obtained and conveyed in breach of Cranmer's fiduciary or other duty of trust or confidence, because Whitesides was assisting Cranmer in finding someone who was distanced from Cranmer to trade on his behalf.

66. McCormick knew, consciously avoided knowing, or was reckless in not knowing that the information he received from Whitesides about the Kaman acquisition was material and nonpublic and that it was conveyed in breach of a fiduciary duty or other duty of trust or confidence. As alleged above, Whitesides told McCormick that the information came from an insider who wanted McCormick to trade on the insider's behalf.

67. Whitesides and McCormick nevertheless traded in Kaman securities while in possession and on the basis of the material nonpublic information they obtained, directly or indirectly, from Cranmer. Both Whitesides and McCormick bought out of the money call options that were set to expire in March 2024. McCormick also tipped his friend, Trader A, who bought the same series of call options.

## CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Against All Defendants)

68. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-67, inclusive, as if they were fully set forth herein.

69. By engaging in the conduct described above, Defendants, directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, or the facility of national securities exchanges, in connection with the purchase or sale of securities, knowingly or recklessly:

    a. employed devices, schemes, or artifices to defraud;

    b. made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

    c. engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

70. By reason of the foregoing, Defendants violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b-5], thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

I.

Permanently restraining and enjoining Defendants from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

II.

Prohibiting Defendant Cranmer from serving as an officer or director of any entity having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

III.

Ordering Defendants Whitesides and McCormick to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

IV.

Ordering Defendants to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

V.

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

## JURY DEMAND

The Commission demands a trial by jury.

Respectfully submitted,

Date:  August 18, 2025          /S/ Ruth C. Pinkel
Joseph G. Sansone
Ruth C. Pinkel*
U.S. Securities and Exchange Commission
Los Angeles Regional Office
444 S. Flower St., Suite 900
Los Angeles, CA 90071
(323) 965-3322 (Pinkel)
pinkelr@sec.gov

*Pending admission pro hac vice